

# NUMBER 13-24-00208-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ANNA MERCEDEZ GUTIERREZ,**                                                  **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                        **Appellee.**

---

## ON APPEAL FROM THE 63RD DISTRICT COURT
## OF KINNEY COUNTY, TEXAS

---

## OPINION ON EN BANC RECONSIDERATION[1]

## Before the Court En Banc

---

[1] This appeal was originally decided by a panel of this Court on December 16, 2024. *Gutierrez v. State*, No. 13-24-00208-CR, 2024 WL 5118180, at *1 (Tex. App.—Corpus Christi–Edinburg Dec. 16, 2024), *withdrawn* (Jan. 15, 2025). On January 15, 2025, the en banc court sua sponte withdrew the December 16, 2024 majority and dissenting opinions and ordered en banc reconsideration of the appeal. *Gutierrez v. State*, No. 13-24-00208-CR (Tex. App.—Corpus Christi–Edinburg Jan. 15, 2025, order) (per curiam). The en banc court consists of Chief Justice Tijerina and Justices Silva, Peña, West, Cron, and Fonseca, and those "members of the panel who are not members of the court but remain eligible for assignment to the court," and thus, also includes the Honorable Gina Benavides, who did not participate in this Opinion. TEX. R. APP. P. 41.2. The Honorable Dori Contreras was an original member of the panel on submission; however, her term of office expired on December 31, 2024, and she is not eligible for assignment. *See id*.; *see also* TEX. GOV'T CODE ANN. § 74.003(b).

## Opinion on En Banc Reconsideration by Justice Silva

A Kinney County jury convicted appellant Anna Mercedez Gutierrez of three counts of smuggling of persons, a third-degree felony, enhanced to a second-degree felony after Gutierrez pleaded true to a repeat-offender enhancement paragraph. *See* TEX. PENAL CODE ANN. §§ 20.05(a)(1)(A), (b),[2] 12.42(a). The jury sentenced Gutierrez to ten years' imprisonment. On appeal, Gutierrez raises four issues: (1) § 20.05(a)(1)(A), as applied to Gutierrez's prosecution, is preempted by federal law; (2) the trial court's denial of Gutierrez's for-cause challenges to two venire panel members was reversible error; (3) Gutierrez's right to confrontation was violated by the admission of certain evidence which was inadmissible hearsay; and (4) the trial court erred in admitting certain evidence over Gutierrez's hearsay challenge. We affirm.[3]

### I. BACKGROUND

At around 11:05 p.m. on February 4, 2023, Kinney County Sheriff's Deputy Erica Mendez was running a stationary radar on State Highway 131 near Brackettville, when she observed a black vehicle traveling at eighty-one miles per hour in a sixty-five miles per hour speed zone. State Highway 131 has one lane in each direction and, according to Deputy Mendez, is generally used by "ranchers" and "local people" to drive to

---

[2] Section 20.05 now carries a minimum prison term of ten years, but the amendment only applies to offenses committed on or after the amendment's effective date of February 6, 2024. *See* TEX. PENAL CODE ANN. § 20.05(b); Act of Oct. 26, 2023, 88th Leg., 3rd C.S., ch. 2 (S.B. 4), §§ 3 ,12, 13, eff. Feb 6, 2024. Gutierrez's offense was committed on February 4, 2023. Thus, any citation to penal code § 20.05 hereinafter refers to the previous version. *See* Act of May 26, 2021, 87th Leg., R.S., ch. 572 (S.B. 576) (current version at TEX. PENAL CODE ANN. § 20.05).

[3] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001(a). We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

Brackettville or by others to circumvent a nearby checkpoint. At the time Deputy Mendez spotted the black vehicle, it was the only vehicle in the area.

After seeing the traffic violation, Deputy Mendez made a U-turn and attempted to catch up to it. She then saw the vehicle approach a stop sign at the intersection of Highways 90 and 131 and the driver failed to activate its turn signal within 100 feet of the intersection. The vehicle then made a left turn on Highway 90 toward Brackettville, which is away from the checkpoint. Deputy Mendez activated her lights and stopped the car. As she approached the vehicle with her flashlight, she observed three male passengers in the back seat, not wearing seatbelts, who were "slouching . . . all the way down," "way below" the "seat level or window level," "lying to the point that [they were] almost lying on the floor," with "half of their body . . . on the floor," in a position which she said was "very uncommon" for travel. The passengers were only visible through Deputy Mendez's use of her flashlight. They had not been visible to her while driving behind the vehicle as the back window of the car had "extremely dark" tint.

Deputy Mendez asked the vehicle's occupants for identification. Gutierrez, the driver, provided her driver's license, which reflected that she lived about 350 miles away in Conroe, Texas. The front passenger also provided his driver's license, which reflected that he was from Splendora, Texas.[4] The back seat male passengers provided Mexican identification cards from which she was able to obtain their names and dates of birth.

Gutierrez told Deputy Mendez that she "didn't know" who the back seat male passengers were and "didn't know that they were illegal aliens." She said that "she picked

_____

[4] Conroe and Splendora are cities in Montgomery County, Texas.

3

them up at a gas station," and "they were going to pay for her fuel." Though Deputy Mendez "radioed for Border Patrol," no Border Patrol agents were able to make it to the scene. Instead, another deputy "transported [the back seat passengers] to Border Patrol." Deputy Mendez stated she arrested Gutierrez "after it was confirmed that the three occupants were in the United States illegally," along with other factors, including (1) the time of night; (2) the location and usage of the roads and route that the vehicle was traveling on, particularly relative to Conroe, Texas; and the (3) "slouching down" postures of the back seat passengers.

Gutierrez was indicted on three counts of knowingly using a motor vehicle to transport an individual with intent to conceal the individual from a peace officer. *See id.* § 20.05(a)(1)(A). A jury found her guilty as charged, and she was sentenced to ten years' imprisonment. Gutierrez filed a motion for new trial arguing, in part, that § 20.05(a)(1)(A) is unconstitutional as applied to her because it is preempted by federal immigration law. The trial court denied the motion for new trial without a hearing, and this appeal followed.

## II.     AS-APPLIED CONSTITUTIONAL CHALLENGE

In her first issue, Gutierrez argues that Texas Penal Code § 20.05(a)(1)(A) is unconstitutional as applied to her because it is preempted by federal immigration law.

### A.     Standard of Review and Applicable Law

"Preemption is a question of law reviewed de novo." *Baker v. Farmers Elec. Coop.*, 34 F.3d 274, 278 (5th Cir. 1994).

Texas Penal Code § 20.05(a)(1)(A) reads:

    (a)    A person commits an offense if the person knowingly:

        (1)    uses a motor vehicle, aircraft, watercraft, or other means of

4

conveyance to transport an individual with the intent to:

> (A)    conceal the individual from a peace officer or special investigator[.]

TEX. PENAL CODE ANN. § 20.05(a)(1)(A).

A party may challenge a statute's constitutionality on its face or as applied to that party. *See Estes v. State*, 546 S.W.3d 691, 697–98 (Tex. Crim. App. 2018) (discussing facial and as-applied constitutional challenges). A party bringing a "facial" constitutional challenge must show that the statute "operates unconstitutionally in all of its applications." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex. Crim. App. 2011). In an as-applied challenge, the claimant "concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *Id.* at 910. An "as applied" challenge must be brought during or after a trial on the merits, "for it is only then that the trial judge and reviewing courts have the particular facts and circumstances of the case needed to determine whether the statute or law has been applied in an unconstitutional manner." *Id*.

On appeal, Gutierrez asserts that "[t]hrough the passage and subsequent amendment of the Immigration and Nationality Act, Congress has established a complete regime to regulate the smuggling of noncitizens." Gutierrez argues that Congress created "an entire interconnected framework" of statutes within immigration law, with 8 U.S.C. § 1324 as the principal statute establishing federal preclusion of state prosecution of smuggling of illegal aliens. In support of her argument, Gutierrez heavily relies on a Colorado Supreme Court case—*Fuentes-Espinoza v. People*, 408 P.3d 445 (Colo. 2017) and three federal circuit court of appeals cases cited therein—*Ga. Latino All. for Hum.*

5

*Rts. v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012) (*GLAHR*); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013).

### 1. Federalism and Preemption

Our Nation was founded on a system of "dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). "This federalist structure of joint sovereigns" benefits the citizens of the United States, as the more "decentralized government[s]" of States are "more responsive" and "more sensitive to the diverse needs" of their own citizenry. *Id*. at 458. "The States thus retain substantial sovereign authority," particularly in the areas "reserved to the several States" which "extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.'" *Id*. at 457–58 (quoting THE FEDERALIST No. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)).

Congress may enact legislation that preempts state laws under the Supremacy Clause. U.S. CONST. art. VI, cl. 2. This is an "extraordinary power in a federalist system" that courts "must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460. The two cornerstones of the Supreme Court's pre-emption jurisprudence are that (1) Congress's purpose "is the ultimate touchstone," and (2)

> [I]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up).

6

Gutierrez relies on implied preemption, rather than express preemption. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (describing conflict preemption as when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision"). A state statute may be impliedly preempted by federal law under either field preemption or conflict preemption. *See Horton v. Kansas City Southern Railway Co.*, 692 S.W.3d 112, 120 (Tex. 2024) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Gutierrez argues that § 20.05(a)(1)(A) is preempted under both field and conflict preemption. *See id.*

In analyzing whether § 20.05(a)(1)(A) is impliedly preempted by federal law, we must begin by analyzing the federal statute that allegedly takes precedence over the state statute because "'[t]here is no federal preemption *in vacuo*,' without a congressional text, federal statute, or treaty made under the authority of the United States." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). "So any '[e]vidence of pre-emptive purpose,' whether expressed or implied, must therefore be 'sought in the text and structure of the [federal] statute at issue.'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (plurality op.) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Accordingly, we analyze an implied preemption contention "much as we would any other [contention] about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation." *Id.* at 767.

But before addressing either argument, we must first consider the presumption against preemption.

## 2. The Presumption against Preemption

Any preemption analysis of § 20.05(a)(1)(A) must begin with the presumption against preemption. *See Wyeth*, 555 U.S. at 565. In the instant case, the presumption against preemption applies because in enacting Texas Penal Code § 20.05(a)(1)(A), Texas legislated in an area traditionally occupied by the states—criminal law enforcement. TEX. PENAL CODE ANN. § 20.05(a)(1)(A). "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Garcia*, 589 U.S. at 212. Unlike the other state statutes at issue in the cases Gutierrez relies upon, *not a single word* of § 20.05(a)(1)(A) intrudes into an area of traditional federal dominance. Rather, it plainly and simply prohibits using a means of conveyance to transport "an individual with the intent to conceal the individual from a peace officer or special investigator." TEX. PENAL CODE ANN. § 20.05(a)(1)(A). While Gutierrez argues that § 20.05(a)(1)(A) is seemingly a regulation of immigration, such characterization is inconsistent with the text of the statute. *See id.* Section 20.05(a)(1)(A) regulates the criminal conduct of smuggling any "individual," regardless of immigration status, and therefore, the presumption against preemption applies. *See id.*; *Wyeth*, 555 U.S. at 565.

Accordingly, in order for § 20.05(a)(1)(A) to be federally preempted, it must be established—by reference to the texts of the federal laws that are said to preempt it—that it was the "clear and manifest purpose" of Congress to overcome the presumption against preemption and to displace state penal laws criminalizing smuggling of an individual in instances when the smuggled individual is an illegal alien. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230

8

(1947)).

## B.    Field Preemption

Under field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice*, 331 U.S. at 230).

The first task in a field preemption analysis is to define the relevant field from which Congress has allegedly ousted State regulation and its boundaries. *See Garcia*, 589 U.S. at 208; *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78–79 (1941) (Stone, J., dissenting) ("Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution.")). "To discover the boundaries[,] we look to the federal statute itself, read in the light of its constitutional setting and its legislative history." *DeCanas*, 424 U.S. at 360 n.8. (quoting *Hines*, 312 U.S. at 78–79 (Stone, J., dissenting)). But even the occupation of a particular field by the federal government does not mean that a state may not legislate in that field as "[o]nly a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify that conclusion." *Id*. at 357 (cleaned up). The United States Supreme Court has been reluctant to find such an intent on the part of Congress and only in "rare cases"

9

has it "found that Congress 'legislated so comprehensively' in a particular field that it left 'no room for supplementary state legislation.'" *Garcia*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)).

Gutierrez argues that the regulation of concealed migrant transport through smuggling statutes is field preempted and urges this Court to adopt the reasoning of the cases by which she relies. Before turning to those cases, however, we note that this viewpoint is not universally held. One federal circuit court and two other state appellate courts have rejected contentions that federal law preempts state criminal statutes which may affect illegal aliens. *See Keller v. City of Fremont*, 719 F.3d 931, 943 (8th Cir. 2013) (rejecting argument that 8 U.S.C. § 1324(a)(1)(A)(iii) precluded state anti-harboring law directed at illegal aliens); *In re Jose C.*, 198 P.3d 1087, 1099 (Cal. 2009) ("We discern no intent by Congress, in either its initial enactment or subsequent amendments of the Immigration and Nationality Act (INA) (8 U.S.C. §§ 1101–1537), to occupy the field of immigration law generally or alien smuggling in particular."); *State v. Flores*, 188 P.3d 706, 412 (Ariz. Ct. App. 2008) ("There is no indication in the INA or its history that Congress intended to preclude harmonious state regulation touching on the smuggling of illegal aliens in particular."). One sister Texas court of appeals has already held that § 20.05(a)(1)(A) is neither field preempted nor conflict preempted. *See Minor v. State*, No. 07-23-00397-CR, 2025 WL 211324, at *3 (Tex. App.—Amarillo, Jan. 15, 2025, no pet.) (mem. op., not designated for publication).

The United States Supreme Court has never held that Congress has field preempted state law regarding the transportation and concealment from law enforcement of illegal aliens. *See* 8 U.S.C. § 1324. Gutierrez quotes *Arizona* for the proposition that

10

"[f]ederal governance of immigration and alien status is extensive and complex," but *Arizona* only found field preemption in the narrow field of alien registration. *Arizona*, 567 U.S. at 395, 402. *Arizona*'s other holdings finding preemption were all decided under conflict preemption. *Id*. at 406, 410. *Arizona* cannot be relied upon to support field preemption beyond the narrow scope of alien registration. *See id.*

The analysis and reasoning in the cases on which Gutierrez relies is likewise unpersuasive and inapplicable. The principal holding on field preemption in *GLAHR*, which is shared by *South Carolina*, *Valle del Sol Inc.*, and *Fuentes-Espinoza*, is that the "INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens" in the various subsections of 8 U.S.C. § 1324 and supported by 8 U.S.C. § 1329. *GLAHR*, 691 F.3d at 1263–266. Those cases also hold that the placement of § 1324 among other federal statutes "criminalizing the acts undertaken by aliens and those who assist them in coming to, or remaining within the United States" "illustrates an overwhelming dominant federal interest in the field." *GLAHR*, 691 F.3d at 1263–64; *see South Carolina*, 720 F.3d at 530–31; *Valle del Sol Inc.*, 732 F.3d at 1024–26; *Fuentes-Espinoza*, 408 P.3d at 451–52. *GLAHR* further described Congress as having "provided a 'full set of standards' to govern the unlawful transport and movement of aliens." *GLAHR*, 691 F.3d at 1264.

But a close examination of § 1324 reveals that nothing in the language of that statute demonstrates a "clear and manifest purpose" that states may not regulate in the area of the "transportation [and] concealment[5] . . . of unlawfully present aliens," i.e., the

---

[5] Because penal code § 20.05(a)(1)(A) only involves transporting with the intent to conceal, the question of preemption as to inducement is not relevant to this appeal. *See* TEX. PENAL CODE ANN.

11

smuggling of illegal aliens. *Id.* at 1263; *see also* 8 U.S.C. § 1324. Nor does any language referring to states appear in the statute except in subsection (c), which permits state law enforcement officials to arrest violators. *See* 8 U.S.C. § 1324(c).

GLAHR cites to § 1324(c) as proof of preemption, describing it as a federal limitation on what states are allowed to do in this area. *See GLAHR*, 691 F.3d at 1263–64 ("Rather than authorizing states to prosecute for these crimes, Congress chose to allow state officials to arrest for § 1324 crimes, subject to federal prosecution in federal court."). But § 1324(c) does no such thing, as that subsection *expands* the groups of officers that may make arrests for this violation of federal law, ensuring that state officers can cooperate in the prosecution of this federal statute through arrest power. *See* 8 U.S.C. § 1324(c). The fact that a state officer has the authority to arrest violators of this federal offense and to work cooperatively with federal authorities on prosecutions of this federal offense says nothing about whether a state is prohibited from enacting a state offense for similar or related behavior. *See id.*

GLAHR's reliance on § 1329 for its related argument—that since the prosecution of § 1324 was restricted to federal courts, states must be impliedly preempted from enacting state laws involving similar or related conduct—is likewise misplaced. *See GLAHR*, 691 F.3d at 1263–265. Section 1329 merely provides that federal district courts have jurisdiction over immigration-related penalties enacted in Subchapter II, Chapter 12 of Title 8. *See* 8 U.S.C. § 1329. This is a readily understandable clarification of jurisdiction as the adjudication of legal issues in other subchapters of Title 8, Chapter 12 are handled

---

§ 20.05(a)(1)(A).

12

by federal immigration judges, not federal district judges. *See*, *e.g.*, 8 U.S.C § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); 8 C.F.R. § 1003.10(a), (b) (setting out authority of immigration judges "to conduct specified classes of proceedings, including hearings under section 240 of the Act" and "other proceedings the Attorney General may assign to them"); 8 C.F.R. § 1003.14(d) (describing jurisdiction of immigration judges to include "exclusion, deportation and removal, rescission, and asylum-only, and other proceedings"). Section 1329 in no way speaks to the preemption of state courts enforcing state laws that may cover similar or related conduct. *See* 8 U.S.C. § 1329. In fact, as this provision gives federal district courts jurisdiction over all causes brought by the United States "under the provisions of this subchapter," it would apply to § 1324a as well. *See id.*, § 1324a. But, as discussed *supra*, § 1324a does not field preempt all state legislation. *GLAHR*'s conclusion that § 1329 buttresses its holding of § 1324 field preemption is unsupported. *See GLAHR*, 691 F.3d at 1263–265.

GLAHR and the related authorities on which Gutierrez relies also make much of the fact that § 1324 has various subparts that describe different kinds of offenses, different levels of punishment, evidentiary considerations, and the creation of an outreach program. *See id.* at 1263–64; *South Carolina*, 720 F.3d at 530–31; *Valle de Sol Inc.*, 732 F.3d at 1024; *Fuentes-Espinoza*, 408 P.3d at 452. *GLAHR* concludes that such detail creates a "comprehensive framework to penalize" the smuggling of illegal aliens such that "a state's attempt to intrude into this area is prohibited." *GLAHR*, 691 F.3d at 1263–64.

But detailed federal statutes are more the norm than the exception as Congress amends statutes dealing with complicated issues that evolve over time. *See DeCanas*,

13

424 U.S. at 359–60 ("Given the complexity of the matter addressed by Congress . . . , a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent." (quoting *N.Y. Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415 (1973))). The length and detail of a single statute alone cannot create a "federal framework of regulation 'so pervasive' . . . or a "federal interest . . . so dominant" as to entirely oust states from the field regulated by that statute. *See Rice*, 331 U.S. at 230. This is evident, again, by looking at § 1324's neighboring statute—§ 1324a, dealing with criminal offenses for alien employment—which is three times the length of § 1324 and even more detailed. *See* 8 U.S.C. § 1324a. Yet, such detail and length did not itself establish preemptive intent as is clear from the insertion of an express preemption subsection in the statute. *See id.* Furthermore, the United States Supreme Court has rejected the argument that certain state statutes were preempted by § 1324a, either expressly or by implication under a field preemption theory. *See Garcia*, 589 U.S. at 204–10. As observed by the Eighth Circuit in *Keller*:

> We find nothing in an anti-harboring prohibition contained in one sub-part of 8 U.S.C. § 1324 that establishes a 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it," or evinces "a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

*Keller*, 719 F.3d at 943 (referencing 8 U.S.C. § 1324(a)(1)(A)(iii)).

Finally, the fact that § 1324 appears in a subpart of Title 8 that involves other immigration-related crimes (General Penalty Provisions) does not demonstrate that the federal government has preempted states from enacting any statutes dealing with criminal behavior that may be in some way related to illegal aliens. *See* 8 U.S.C. § 1324. As noted, *supra*, the United States Supreme Court has held the contrary regarding

14

another statute that appears in this same subpart—§ 1324a. *See Garcia*, 589 U.S. at 204–10. That Congress has made certain conduct related to illegal aliens federal crimes does not automatically preempt a State from enacting state laws that also relate to such conduct or might in some way impact illegal aliens. *See id.*

In fact, in at least one related area—human trafficking—federal law presumes state prosecution of crimes involving illegal aliens under state law as demonstrated by the enactment of federal laws that assist states in state prosecutions. *See Flores v. State*, 679 S.W.3d 232, 245, n.10 (Tex. App.—San Antonio 2023, pet. ref'd) (setting out various federal laws providing visas for trafficking and crime victims, providing authority for certain trafficking victims to remain in the country to assist with investigation and prosecution of traffickers, and providing that the federal government develop and distribute materials to aid states in state trafficking prosecutions). If § 1324 preempted all state prosecutions in which illegal aliens are transported, there would be no need for such state laws. *See* 8 U.S.C. § 1324.

Nevertheless, to the extent that § 1324 could be held to preempt any state legislation regarding the smuggling of illegal aliens, it could only do so within the limits of its own boundaries as set out in the text of the relevant subsections. *See State v. Cuarenta*, 707 S.W.3d 424, 427–28 (Tex. Crim. App. 2025) ("We presume that the Legislature intended for every word to have a purpose, and we should give effect if reasonably possible to each word, phrase, and clause of the statutory language"). That text makes it an offense for a person to:

> (ii)     knowing or in reckless disregard of the fact *that an alien has come to, entered, or remains in the United States in violation of law*, transport[ ], or move[ ], or attempt[ ] to transport or move *such alien*

15

within the United States by means of transportation or otherwise, *in furtherance of such violation of law*; or

(iii)    knowing or in reckless disregard of the fact *that an alien has come to, entered, or remains in the United States in violation of law*, conceal[ ], harbor[ ], or shield[ ] from detection or attempt[ ] to conceal, harbor, or shield from detection *such alien* in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(ii), (iii) (emphasis added). Comparing the language of § 1324(a)(1)(A)(ii) and (iii) with the statutes struck down in *GLAHR*, *Valle del Sol Inc.*, *South Carolina*, and *Fuentes-Espinoza* readily illustrates how those state statutes fell squarely within the same field as § 1324 because they all expressly utilized statutory language that "directly criminalize the smuggling of noncitizens." *Flores*, 679 S.W.3d at 246; *see also GLAHR*, 691 F.3d at 1263–267 (discussing GA. CODE ANN. §§ 16-11-200, 16-11-201); *Valle del Sol Inc.*, 732 F.3d at 1012–13 (discussing prior version of ARIZ. REV. STAT. § 13-2929); *South Carolina*, 720 F.3d at 522–23 (discussing S.C. CODE ANN. § 16-9-460); and *Fuentes-Espinosa*, 408 P.3d at 447 (discussing former COLO. REV. STAT. ANN. § 18-13-128 (repealed)). In contrast, the portion of Texas's human smuggling statute at issue in this case reads:

(a)    A person commits an offense if the person knowingly:

(1)    uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to:

(A)    conceal the individual from a peace officer or special investigator[.]

TEX. PENAL CODE ANN. § 20.05(a)(1)(A). Thus, even if Congress, through the enactment of 8 U.S.C. § 1324, intended to preempt states from enacting laws that regulate in the field of "transportation [and] concealment . . . of unlawfully present aliens," *GLAHR*, 691

F.3d at 1263, by "criminaliz[ing] the smuggling of noncitizens," *Flores*, 679 S.W.3d at 246, that intent would not preempt Texas Penal Code § 20.05(a)(1)(A), which does not criminalize the smuggling of illegal aliens. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A). Given its neutral language and general application to the smuggling of *all* persons, § 20.05(a)(1)(A) would not fall within the boundaries of any field preemption by 8 U.S.C. § 1324, which only applies to the criminal smuggling of illegal aliens. *See id.* Accordingly, Gutierrez's cited cases are inapplicable to the question before us today.

Decisions on whether other states' statutes (which explicitly include federal immigration law or immigration status in their text and an element of the offense) are preempted by 8 U.S.C. § 1324 (which expressly regulates the smuggling of illegal aliens), provide no applicable guidance on whether Congress has expressed the clear and manifest purpose to preempt Texas from enforcing § 20.05(a)(1)(A)—a neutral criminal statute that does not reference or rely on federal immigration law or immigration status in any way. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A); *see also State v. Burciaga*, No. 08-23-00034-CR, 2024 WL 3917196, at \*17 (Tex. App.—El Paso August 23, 2024, pet. ref'd) (mem. op., not designated for publication) (Alley, C.J., concurring) ("And even if those cases correctly decided the challenges to other state[s'] laws, their application fails here. Section 20.05(a)(1)([A]) does not require as an element of the offense that the person being smuggled is an illegal alien.").

Nevertheless, Guiterrez argues that, as applied to her case, the State explicitly brought prosecution to target the smuggling of illegal aliens. *See Fine*, 330 S.W.3d at 910 ("[A]n 'as applied' challenge . . . asserts that [a] statute is unconstitutional as applied to his particular facts and circumstances"). We disagree. The evidence shows that Gutierrez

17

was not convicted merely because of the citizenship status of the back seat passengers, but because she intended to conceal those individuals from law enforcement. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A). Gutierrez was stopped at 11:00 p.m. for speeding and failing to utilize her vehicle's turn signal while driving on a road often used to circumvent a border checkpoint. The back seat passengers were not visible to Deputy Mendez due to the vehicle's "extremely dark" tint. However, utilizing her flashlight, Deputy Mendez observed the back seat passengers not wearing seatbelts and slouching down below the "seat or window level," their bodies in a position "very uncommon" for travel. As discussed above, such conduct is criminalized regardless of immigration status.[6]

We hold that § 20.05(a)(1)(A) is not field preempted as applied to Gutierrez's prosecution. *See* TEX. PENAL CODE § 20.05(a)(1)(A); *see also Garcia*, 589 U.S. at 211–12; *Arizona*, 567 U.S. at 399; *Minor*, 2025 WL 211324, at *3 (rejecting the appellant's as-applied preemption challenge to § 20.05(a)(1)(A) after "[f]inding no evidence of conduct conflicting with federal immigration objectives, and because [the a]ppellant's conviction rested on his concealment conduct rather than his passengers' status").

## C.     Conflict Preemption

Gutierrez also argues that § 20.05(a)(1)(A) is preempted because it conflicts with the "purposes and objectives" of 8 U.S.C. § 1324. We disagree.

Under conflict preemption, state laws are preempted (1) when "compliance with both federal and state regulations is a physical impossibility," and (2) "where the

---

[6] The fact that the back seat passengers turned out to be illegal aliens was relevant to Gutierrez's motive to conceal the back seat passengers from law enforcement. However, proof of motive is not a required element in criminal cases. *See Pollard v. State*, 255 S.W.3d 184, 188 (Tex. App.—San Antonio, 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009).

18

challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399–400 (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963); and then quoting *Hines*, 312 U.S. at 67)). But reviewing courts may not conduct "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" as this would "undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Rather, like all preemption inquiries, conflict preemption must be rooted in the law actually enacted by Congress. *See Horton*, 692 S.W.3d at 120.

In support of her argument, Gutierrez notes that 8 U.S.C. § 1324 includes punishment schemes and evidentiary standards that differ from those found in § 20.05(a)(1)(A). *See* 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii), (B)(i), (d). In particular, Gutierrez argues that in order to convict her under 8 U.S.C. § 1324, federal prosecutors must prove that she "kn[ew]" or was "in reckless disregard of the fact" that her passengers "ha[d] come to, entered, or remain[ed] in the United States in violation of law," and, if convicted, Gutierrez would face a lower sentencing range.[7] *See* 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii), (B)(i). Gutierrez also asserts that a state prosecution thus undermines Congress's intent in enacting 8 U.S.C. § 1324 and would be a "theft of [federal] authority [that would] allow[] the State to prosecute noncitizen smuggling cases 'in a manner unaligned with federal

---

[7] Gutierrez's prior criminal history, if any, may impact any potential federal sentence under 8 U.S.C. § 1324.

19

immigration enforcement priorities.'" *Valle del Sol Inc.*, 732 F.3d at 1027.

But both of these arguments fail to recognize that Texas Penal Code § 20.05(a)(1)(A) is an exercise of Texas's police powers to enact criminal laws prohibiting certain conduct in its boundaries, just as 8 U.S.C. § 1324 is an exercise of the federal government's powers to do the same. These are different criminal statutes by different sovereigns criminalizing different conduct and assigning different punishments. Contrary to Gutierrez's characterization, 8 U.S.C. § 1324 is *not* an"analogous federal statute" to § 20.05(a)(1)(A). *See Flores*, 679 S.W.3d at 245. It is a feature of our system of dual sovereignty that, in the area of criminal law, both the state and federal government may legislate, and it has long been settled that a person may be liable to punishment for the same act for both state and federal offenses. *See Bartkus v. Illinois*, 359 U.S. 121, 131–32 (1959). The fact that state and federal criminal offenses may have different elements and different ranges of punishment does not create a conflict. *See id.*; *see also Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) ("The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption.").

Furthermore, the United States Supreme Court, in its most recent pronouncement regarding preemption in a context involving illegal aliens, has expressly rejected the argument that a state law is conflict preempted because state prosecution "would risk upsetting federal enforcement priorities and frustrating federal objectives, such as obtaining the cooperation of unauthorized aliens in making bigger cases." *See Garcia*, 589 U.S. at 211, 212.

As explained by *Garcia*:

The mere fact that state laws . . . overlap to some degree with federal

20

criminal provisions does not even begin to make a case for conflict preemption. From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today. In recent times, the reach of federal law has expanded, and there are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors. Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap . . . . In the end, however, the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to "the Laws of the United States," not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl.2.

*Id*. at 211–12. This authority resolves the question before us on conflict preemption. *See id.* In light of the applicable jurisprudence on the relationship between the States and federal government in the realm of criminal law, and the recent holding of *Garcia*, we hold that § 20.05(a)(1)(A) is not conflict preempted. *See id.*

## D.     § 20.05(a)(1)(A) is Constitutional as Applied to Gutierrez

For the foregoing reasons, we hold that § 20.05(a)(1)(A) is not federally preempted by 8 U.S.C. § 1324, which governs different criminal conduct prohibited by a different sovereign with its own punishment scheme in accord with its own priorities, and which does not make a distinction between citizens and illegal aliens on its face. Texas has the right to enact and enforce § 20.05(a)(1)(A)—a neutral criminal statute applicable to all who smuggle, and all who are smuggled, regardless of nationality—to prevent criminal conduct that Texas determines should be prohibited and to punish such conduct in accordance with Texas's priorities. We further conclude that § 20.05(a)(1)(A) is not unconstitutional as applied to the specific facts and circumstances of Gutierrez's case. We overrule Gutierrez's first issue.

21

### III.    CHALLENGES FOR CAUSE

By her second issue, Gutierrez argues that the trial court erred when it denied her for-cause challenges to two veniremembers.

"The standard of review on appeal is whether the trial court abused its discretion when it overruled a challenge for cause." *Buntion v. State*, 482 S.W.3d 58, 84 (Tex. Crim. App. 2016). In making this determination, we review the challenged veniremember's voir dire in its entirety to determine whether the record shows the veniremember's bias would affect their ability to serve on the jury and abide to the oath. *See id.* We afford great deference to the trial court's ruling because the trial judge is present to evaluate the potential juror's statements and disposition. *See Hudson v. State*, 620 S.W.3d 726, 731 (Tex. Crim. App. 2021); *Buntion*, 482 S.W.3d at 84; *Gardner v. State*, 306 S.W.3d 274, 296–97 (Tex. Crim. App. 2009). "Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory." *Buntion*, 482 S.W.3d at 84. We will reverse the trial court's ruling on a challenge for cause only if there has been a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296.

"[H]arm from the erroneous denial of a defense challenge for cause focuses on whether a peremptory challenge was wrongfully taken from the defendant." *Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (cleaned up). To establish harm for an erroneous denial of a challenge for cause, the defendant must show on the record that "(1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of [veniremember]; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury." *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014) (quoting

22

*Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010)). "Furthermore, the defendant must make the trial court aware of the complaint at a time and in a manner in which it could be corrected." *Rodriguez v. State*, 345 S.W.3d 504, 506–07 (Tex. App. 2011) (first citing *Loredo v. State*, 159 S.W.3d 920, 923 (Tex. Crim. App. 2004); and then citing TEX. R. APP. P. 33.1). "In other words, before the jury is seated, the defendant must have requested an additional peremptory strike that he claims he would use to remove another veniremember whom the defendant identifies as 'objectionable' and who actually sits on the jury." *Id.* at 507; *see also Comeaux*, 445 S.W.3d at 752 (Johnson, J., concurring) ("[I]f a litigant does not notify the trial court that a juror who is perceived as biased against the litigant has been seated on the jury, the trial court may not know that the litigant objects and thus will have no reason to reconsider its ruling in light of any stated objections to that juror by the litigant.").

Here, the record shows that at the beginning of voir dire, the trial court instructed the veniremembers to stand and provide their assigned "juror numbers" when responding to questions. Throughout the general voir dire, the parties referred to veniremembers by their assigned juror numbers. The parties then conducted individual voir dire after Gutierrez's counsel identified numerous veniremembers whom she intended to challenge for cause. Specifically, Gutierrez made challenges for cause to "Juror 16" and "Juror 35," and the trial court denied those challenges. Individual questioning of the venire ultimately yielded thirty-three veniremembers whom the trial court deemed qualified to serve as jurors in the case. The trial court re-assigned juror numbers to these qualified veniremembers and then recessed proceedings for a short break to allow the parties to submit up to ten peremptory challenges. *See* TEX. CODE CRIM. PROC. ANN. art. 35.15(b)

23

(allotting the parties in a non-capital felony case ten peremptory challenges each). The following exchange occurred after proceedings resumed:

> [Defense Counsel]: We made challenges for cause on 16, 42, 40[,] and 35. They were denied, so we used peremptory challenges on those jurors. We have exhausted our peremptory challenges, and now we're making our argument for four additional strikes.
>
> THE COURT: All right. That will be denied.
>
> [Defense Counsel]: And then afterwards if we can make a record after they get in the box.
>
> THE COURT: That will be granted.

The trial court then announced the names of the veniremembers who ultimately comprised the jury. The trial court asked the parties if they had "[a]ny objections to the basis of the strikes made by the opposing party," and neither party made an objection. The remaining veniremembers who were not selected were excused, and the trial court swore in the selected jurors. Thereafter, the trial court provided instructions to the jury and asked the parties if they had "[a]nything" to say. Defense counsel responded, "No. Just quickly to put on record, but we can discharge the jury before that." The trial court then dismissed the jury for the day. On the record and outside the presence of the jury, the following exchange occurred:

> THE COURT: All right. You may be seated. We're still on the record on 3661-CR. What do you have for us?
>
> [Defense Counsel]: I'm just identifying the objectionable jurors that we were forced to accept due to challenges for cause not being granted, and those are 3, 4[,] and 19, which we would have excluded on—
>
> [Court Reporter]: Slow down. Slow down.

24

| [Defense Counsel]: | Sorry. 3, 4, and 19, who we would have struck based on the answers to the presumption of innocence questions. And Juror Number 17, who we would have struck based on his relation to law enforcement. That's all, Judge. |
|---|---|
| THE COURT: | All right. Let the record reflect your objections. All right. Anything else? |
| [Defense Counsel]: | That's it. |
| THE COURT: | All right. Then we'll see you tomorrow. |

Even assuming the trial court erred in denying Gutierrez's challenges for cause for "Juror 16" and "Juror 35," the record is clear that, at the time Gutierrez's trial counsel requested additional peremptory strikes, his counsel did not identify any "objectionable" veniremembers against whom the additional peremptory strikes would have been used. *See Rodriguez*, 345 S.W.3d at 507 ("Because Rodriguez's trial counsel did not identify the objectionable venireperson when he requested an additional peremptory strike, Rodriguez cannot show harm."). It was only after the jury was seated, sworn, and excused that Gutierrez's trial counsel argued to the trial court that its denial of extra strikes forced him to accept veniremembers 3, 4, 17, and 19 as jurors. *See id.* at 506–07. Because Gutierrez's trial counsel did not identify the objectionable jurors when he requested additional peremptory strikes, Gutierrez has failed to preserve this issue. *See* TEX. R. APP. P. 33.1; *Harris v. State*, 572 S.W.3d 325, 331 (Tex. App.—Austin 2019, no pet.) (holding that defendant did not properly preserve argument that the trial court erred by overruling his challenge for cause against veniremember because he "did not complain until after . . . the jury was seated, and the court had excused the rest of the venire"); *Rodriguez*, 345 S.W.3d at 507; *see also Comeaux*, 445 S.W.3d at 752 (Johnson, J.,

concurring). We overrule Gutierrez's second issue.

### IV. HEARSAY AND CONFRONTATION CLAUSE CHALLENGES

By her third and fourth issues, Gutierrez argues that the trial court reversibly erred when it denied her hearsay and confrontation clause objections to certain portions of Deputy Mendez's testimony. *See* U.S. CONST. amend. VI.

### A. Standard of Review and Applicable Law

We review a trial judge's evidentiary rulings for abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). We may uphold a trial court's ruling on the admission of evidence if the ruling is proper under any legal theory or basis applicable to the case. *See Najar v. State*, 618 S.W.3d 366, 373 (Tex. Crim. App. 2021); *see also Bohanna v. State*, No. 14-19-00936-CR, 2021 WL 1917663, at *7 (Tex. App.—Houston [14th Dist.] May 13, 2021, pet. ref'd) (mem. op., not designated for publication) ("Because we will uphold a trial court's ruling on the admission or exclusion of evidence if the ruling was proper under any legal theory or basis applicable to the case, we are not limited to considering only the cases cited by the State in the trial court.").

Hearsay is an out-of-court statement made by a declarant, offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). For purposes of the hearsay rule, a "statement" means a person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression. *Id*. R. 801(a). "Declarant" means the person who made the statement. *Id.* R. 801(b). Hearsay not admissible unless a statute or rule provides otherwise. *Id*. R. 802.

Even when a statement offered against a defendant is admissible under evidentiary rules, the statement may nonetheless implicate the Confrontation Clause of

26

the Sixth Amendment. *Clark v. State*, 282 S.W.3d 924, 930 (Tex. App.—San Antonio 2009, pet. ref'd). An out-of-court statement implicates the Confrontation Clause when it is: (1) made by a witness who is absent from trial and (2) testimonial in nature. *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011). Whether a particular out-of-court statement is testimonial is a question of law. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010). "Although we defer to the trial court's resolution of credibility issues and historical fact, we review *de novo* the ultimate constitutional question of whether the facts as determined by the trial court establish that an out-of-court statement is testimonial." *Id.*

The Confrontation Clause of the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees an accused the right to confront and cross-examine adverse witnesses. U.S. CONST. amends. VI, XIV; *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008); *Clark*, 282 S.W.3d at 930. The principal concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Clark*, 282 S.W.3d at 930 (citing *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). "[F]ace-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." *Craig*, 497 U.S. at 846.

**B.    Testimony**

During trial, Deputy Mendez testified that during the traffic stop, the three back seat male passengers provided her with identification upon her request. The following exchange occurred:

[Prosecutor]: Okay. And so after you identified [Gutierrez] and the [front passenger], was there anything else you observed about the back passengers?

[Deputy Mendez]: Yes. Well, they were slouching down, so, you know, it's very uncommon to travel like that, so I asked for —they were not wearing seatbelts, so I asked for an I.D.

[Prosecutor]: Okay. And did you ask for their I.D.s because they weren't wearing seatbelts?

[Deputy Mendez]: Yes, ma'am, I did.

[Prosecutor]: Did you also ask for their I.D. for officer safety?

[Deputy Mendez]: Yes.

[Prosecutor]: Okay. And were they able to provide you any identification?

[Deputy Mendez]: Yes, ma'am, they did.

[Prosecutor]: Okay. And how did [the back seat passengers]— what was the identification they provided?

[Deputy Mendez]: Objection, Your Honor; hearsay, confrontation, and I also believe if I understand the Court's instructions earlier—well, I'll ask for a running objection on that.

THE COURT: All right. It's overruled.

[Prosecutor]: All right. You can answer the question. What did they use to identify themselves?

[Deputy Mendez]: They used to identify themselves with Mexican I.D. cards.

[Prosecutor]: All three of them?

[Deputy Mendez]: Yes, ma'am.

[Prosecutor]: Okay. And were these males or females?

[Deputy Mendez]: I believe they were all males.

28

[Defense Counsel]:     Objection . . . to hearsay and confrontation.

THE COURT:     All right. It will be overruled.

[Defense Counsel]:     And is the Court okay if I, to try to speed things up, just say same objection in the future?

THE COURT:     Yes, please.

. . . .

[Prosecutor]:     Okay. And would . . . the Mexican identification cards, were you then able to identify them?

[Deputy Mendez]:     Yes, ma'am.

[Defense Counsel]:     The same objection.

THE COURT:     Overruled. You can answer.

[Deputy Mendez]:     Yes.

[Prosecutor]:     [D]id you include . . . the names of the passengers, in your police report?

[Deputy Mendez]:     Yes, ma'am, I did.

[Prosecutor]:     Okay. And if I were to ask you the names of those passengers[,] would you know, off the top of your head?

[Deputy Mendez]:     No, I wouldn't. I have to see the report.

[Prosecutor]:     Judge, may I approach the witness and let her see her report so she can identify the passengers by their names?

THE COURT:     Yes.

. . . .

[Prosecutor]:     All right. Will you read the names of the first back[]seat passengers that you identified?

29

| | |
|---|---|
| [Deputy Mendez]: | Yes, number one, Jorge Azael Ramirez Gaytan, date of birth [February 15] of 1982, Mexican national. |
| [Defense Counsel]: | I'm sorry, Your Honor, same objection. |
| THE COURT: | It will be overruled. You can answer. |
| [Prosecutor]: | Okay. Go ahead. |
| [Deputy Mendez]: | Number two, Cortez Sanchez, Yasaret. Date of birth August 5[], 1986, Mexican national. |
| [Defense Counsel]: | The same objection. |
| THE COURT: | It will be overruled. You can answer. |
| [Deputy Mendez]: | Number three, Rodriguez Aviles, Abraham. Date of birth [January 10] of 1987, Mexican national. |

Later the prosecutor asked Deputy Mendez what she did with the back seat passengers once they were identified by their Mexican identification cards, and Deputy Mendez replied that she "radioed for Border Patrol." However, she explained that Border Patrol was not able to make it to the scene and that one of the sheriff's deputies instead transported the back seat passengers to Border Patrol. Subsequently, Deputy Mendez testified regarding things she had observed about the traffic stop that she considered a form of concealment. The prosecutor asked her, "[D]id you say that at some point you made a decision to arrest . . . Gutierrez," and Deputy Mendez replied, "Yes, after it was confirmed that the three occupants were in the United States illegally." Gutierrez then lodged hearsay and confrontation clause objections, which were overruled by the trial court. During cross-examination, the following exchange occurred:

| | |
|---|---|
| [Defense Counsel]: | [Y]ou testified earlier that you called U[nited]S[tates] Border Patrol to your location? |

30

[Deputy Mendez]: Yes.

[Defense Counsel]: And that was to pick up the three people that were in the back[]seat?

[Deputy Mendez]: [I] called them to identify if they were here illegally.

[Defense Counsel]: Okay. And because Border Patrol wasn't available, it was the—

[Deputy Mendez]: They were understaffed.

[Defense Counsel]: —it was the Sheriff's Office that transported them to Border Patrol?

[Deputy Mendez]: Yes.

[Defense Counsel]: Okay. And the Kinney County Sheriff's Office has a working relationship with Border Patrol?

[Deputy Mendez]: Yes.

[Defense Counsel]: And that's a federal law enforcement agency?

[Deputy Mendez]: Yes.

[Defense Counsel]: And you testified that you reviewed the I.D. cards?

[Deputy Mendez]: Yes.

. . . .

[Defense Counsel]: Okay. Did [Gutierrez] make any additional voluntarily statements?

[Deputy Mendez]: No.

[Defense Counsel]: Okay.

[Deputy Mendez]: Oh, she did.

[Defense Counsel]: Okay.

[Deputy Mendez]: Yes, I do recall that.

31

[Defense Counsel]:      And what was that?

[Deputy Mendez]:      That they didn't know that they were illegal aliens. That they were going to pay for her fuel.

[Defense Counsel]:      Okay.

## C.    Nationality of the Back Seat Passengers

In her fourth issue, Gutierrez argues that Deputy Mendez testified the "Mexican identification cards" of each back seat passenger stated that they were "Mexican national[s]" and that said statements were made by an out-of-court declarant and were offered to prove the truth of the matter asserted, which was the back seat passengers' nationality. Gutierrez further argues that the State "did not establish a hearsay exception applied to the passengers' nationalities, as relied upon by their IDs."[8]

We first note that Deputy Mendez did not testify in the manner in which Gutierrez presents in her brief. As shown above, the prosecutor asked Deputy Mendez, "[W]hat was the identification [the back seat passengers] provided?" Gutierrez then lodged hearsay and confrontation clause objections, which were immediately overruled by the trial court. The prosecutor then asked Deputy Mendez, "What did they use to identify themselves," and Deputy Mendez replied, "They used to identify themselves with [sic] Mexican I.D. cards." Deputy Mendez's testimony does not involve any "statement" under Rule 801. *See* TEX. R. EVID. 801(a)–(b). Deputy Mendez did not elicit an oral or written verbal expression, nor testify regarding nonverbal conduct that a person intended as a substitute for verbal expression. *See id.* However, even assuming "a statement" was involved, we conclude that the complained-of testimony was not offered to prove the truth

---

[8] Gutierrez does not raise a confrontation clause issue on appeal with respect to this testimony.

of the matter asserted—that the back seat passengers were Mexican nationals—because Deputy Mendez explained that she asked the back seat passengers' for identification because they were not wearing seatbelts at the time of the traffic stop and for officer safety. In addition, "[t]he Court of Criminal Appeals has concluded that if a statement is introduced to explain how a defendant became a suspect or how the investigation focused on a defendant, then the statement is not hearsay because it is not offered for the truth of the matter asserted." *Nickerson v. State*, 312 S.W.3d 250, 262 (Tex. App.—Houston [14th Dist.] 2010 pet. ref'd) (first citing *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); and then citing *Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001) (holding testimony was not hearsay because it was not offered for the truth of the matter asserted, but to explain how the police officer began to suspect the appellant, seek an arrest warrant, and finally arrest him)). Our review of the evidence leads us to also conclude that the complained-of testimony established how Gutierrez became a suspect; therefore, it is not hearsay. *See id.* Because Deputy Mendez's testimony was not hearsay, we accordingly find the trial court did not abuse its discretion in denying Gutierrez's hearsay objection.

Gutierrez also argues that Deputy Mendez's testimony that the back seat passengers were Mexican nationals was hearsay. As shown above, Deputy Mendez read from her report the names, dates of birth, and nationalities of each back seat passenger. Nothing in Deputy Mendez's testimony indicates that she was relaying the out-of-court

33

statements of any declarant, including the back seat passengers.[9] *See id.*; *cf. Elsik v. State*, 678 S.W.3d 360, 365–68 (Tex. App.—San Antonio 2023) (holding that a Border Patrol agent's testimony regarding the statements of smuggled passengers providing their names, nationalities, and birth dates was hearsay), *aff'd*, No. PD-0703-23, 2024 WL 4898042 (Tex. Crim. App. Nov. 27, 2024). In other words, Deputy Mendez did not testify that the back seat passengers communicated to her—verbally, non-verbally, or in writing—about their nationalities. *See* TEX. R. EVID. 801(a)–(b).

## D.     Confirmation of the Immigration Status of the Back Seat Passengers

In her third issue, Gutierrez argues that Deputy Mendez "testified that Border Patrol confirmed to her 'that the three occupants were in the United States illegally,'" and that said testimony was impermissible hearsay and violated her rights under the Confrontation Clause.

### 1.     Hearsay

We note again that Deputy Mendez did not testify in the manner Gutierrez asserts in her brief. As discussed above, when the prosecutor asked Deputy Mendez, "[D]id you say that at some point you made a decision to arrest . . . Gutierrez," she responded, "Yes, after *it was confirmed* that the three occupants were in the United States illegally." (emphasis added). Even assuming the trial court erred in denying Gutierrez's hearsay objection, we will consider whether Gutierrez suffered harm from the assumed error.

The erroneous admission of hearsay is non-constitutional error that is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX.

---

[9] We note that during cross examination, Deputy Mendez testified that she did not recall if she took copies of the back seat passengers' I.D. cards but stated that she "did get the names of them."

34

R. APP. P. 44.2(b). We must disregard non-constitutional error unless it affects the substantial rights of the defendant. *Id*. "A substantial right is affected when an error has a substantial and injurious effect or influence in determining the jury's verdict." *Paradoski v. State*, 477 S.W.3d 342, 348–49 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Delane v. State*, 369 S.W.3d 412, 423 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd)). In assessing the likelihood that the jury's decision was adversely affected by the presumed error, we consider everything in the record, including any testimony or physical evidence, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *See id.* A criminal conviction should not be overturned for non-constitutional error if, after examining the entire record, we have fair assurance that the error did not influence the jury or had but a slight effect. *See id.*

A person commits smuggling of persons if they knowingly use a motor vehicle "to transport an individual with the intent to . . . conceal the individual from a peace officer[.]" TEX. PENAL CODE ANN. § 20.05(a)(1)(A). The term "conceal" is not defined by statute, so jurors may assign it any meaning which is acceptable in common parlance. *See id.*; *see also Dunham v. State*, 666 S.W.3d 477, 484 (Tex. Crim. App. 2023) (noting that "undefined statutory terms 'are to be understood as ordinary usage allows, and jurors may thus freely read statutory language to have any meaning which is acceptable in common parlance'" (quoting *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011))); *Minor*, 2025 WL 211324, at *3; *Garza v. State*, No. 03-21-00241-CR, 2022 WL 17169844, at *4 (Tex. App.—Austin Nov. 23, 2022, no pet.) (mem. op., not designated for publication). The word "conceal" is generally understood to mean "to hide, to remove

from sight or notice, or to keep from discovery or observation." *Stahmann v. State*, 548 S.W.3d 46, 55 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020) (cleaned up).

We first examine the evidence presented at trial, excluding the complained-of testimony. Deputy Mendez observed Gutierrez driving her vehicle sixteen miles over the posted sixty-five-miles-per-hour speed limit at 11:00 p.m. on State Highway 131, a road Deputy Mendez affirmed was often used to circumvent the checkpoint. Deputy Mendez also observed that Gutierrez failed to utilize her turn signal before turning left on State Highway 90, driving in a direction further away from the checkpoint. During the traffic stop, Deputy Mendez utilized her flashlight and observed the back seat passengers not wearing seatbelts and slouching down below the "seat or window level," their bodies half lain on the floor in a position "very uncommon" for travel. Prior to the traffic stop, the back seat passengers had not been visible to Deputy Mendez due to the back window having "extremely dark" tint. After Deputy Mendez requested identification of all occupants of the vehicle, Gutierrez provided her driver's license, which indicated she lived 350 miles away in Conroe. The back seat passengers provided Deputy Mendez with Mexican identification cards. Gutierrez also stated that she "didn't know" who the back seat passengers were, "didn't know that they were illegal aliens," that "she picked them up at a gas station" and "they were going to pay for her fuel."

While the complained-of evidence was relevant to Gutierrez's motive to conceal the back seat passengers from law enforcement, proof of motive is not a required element in criminal cases. *See Pollard v. State*, 255 S.W.3d 184, 188 (Tex. App.—San Antonio, 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009); *DeLeon v. State*, 77 S.W.3d 300,

312–13 (Tex. App.—Austin, 2001 pet. ref'd) ("Motive is not an essential element of a criminal case and need not be proved to sustain the commission of the offense." (first citing *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982); and then citing *Zuliana v. State*, 903 S.W.2d 812, 826–27 (Tex. Crim. App.—Austin 1995, pet. ref'd))). Considering the evidence presented at trial and excluding the complained-of testimony, we conclude that admission of the complained-of testimony did not affect Gutierrez's substantial rights. It had a slight effect, if any, on the jury's verdict. *See King*, 953 S.W.2d at 271; TEX. R. APP. P. 44.2(b).

### 2. Confrontation

As part of her third issue, Gutierrez asserts that the complained-of statement was testimonial and violated her confrontation rights.

The threshold issue in a Confrontation Clause inquiry is whether the challenged out-of-court statement is testimonial. *Langham*, 305 S.W.3d at 576; *Trigo v. State*, 485 S.W.3d 603, 610 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). The Supreme Court has identified three types of out-of-court statements that comprise a "core class of 'testimonial' statements":

(1)   *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

(2)   extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and

(3)   statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

37

*Crawford v. Washington*, 541 U.S. 36, 51–52 (2004) (citations and quotations omitted).

Two years later, the United States Supreme Court further clarified the distinction between

testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court has stressed that courts, in

determining the "primary purpose" of the interrogation or interview, must view the

circumstances from an objective point of view:

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

*Michigan v. Bryant*, 562 U.S. 344, 360 (2011). Regarding the existence of an ongoing

emergency, the Court further stated:

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Rather, it focuses them on "end[ing] a threatening situation." *Id.* at 832. Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably

38

significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

*Id.* at 361.

In this case, at the time Deputy Mendez sought confirmation of the back seat passengers' immigration status by Border Patrol, she was responding to an "ongoing emergency." Deputy Mendez initiated a traffic stop of Gutierrez for driving infractions. Upon walking up to the vehicle, Deputy Mendez utilized her flashlight and saw the back seat passengers not wearing seatbelts and slouching down below the "seat or window level," their bodies half lain on the floor in a position "very uncommon" for travel. Though Deputy Mendez received Mexican I.D. cards from the back seat passengers upon her request, she had not yet fully determined whether she was witnessing a human smuggling, human trafficking, kidnapping, or other such ongoing emergency. Indeed, when asked whether the back seat passengers' Mexican I.D. cards indicated to her that they were not residents of the United States, Deputy Mendez replied, "Possibly. That's the reason why the Border Patrol, you know, tried to confirm that." The stop for traffic infractions became an investigation into the unexpected, concealed passengers. Thus, the record indicates that Deputy Mendez radioed Border Patrol at a time when Deputy Mendez was ascertaining "what is happening" as opposed to "what happened." *See Davis*, 547 U.S. at 830. Furthermore, Deputy Mendez testified that she did not arrest Gutierrez until after confirmation of the back seat passengers' immigration status, along with other factors, including (1) the time of night, (2) the location and usage of the roads and route that the vehicle was traveling on, particularly relative to Conroe, and the (3) "slouching down" postures of the back seat passengers. Because the out-of-court

39

statement by Border Patrol confirming the passengers' immigration status was not testimonial, we conclude that the trial court did not abuse its discretion in denying Gutierrez's confrontation clause objection. *See Bryant*, 562 U.S. at 360–61; *Davis*, 547 U.S. at 822; *Inthalangsy*, 634 S.W.3d at 754. We overrule Gutierrez's third issue.

## V.    CONCLUSION

The judgment of the trial court is affirmed.

CLARISSA SILVA
Justice

Publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed on the
19th day of August, 2025.